The State of ARIZONA, DEPARTMENT
OF LAW, CIVIL RIGHTS DIVISION,
and Angela Aguilar, Plaintiffs,

v.

ASARCO, L.L.C., a Delaware limited
liability company, Defendant.

No. CV 08–441 TUC–MWB.

United States District Court,
D. Arizona.

July 13, 2011.

Sandy Forbes of Waterfall, Economidis, Caldwell, Hanshaw and Villamana P.C., in Tucson, Arizona, for Angela Aguilar.

Ann Ruth Hobart, Office of the Attorney General, Phoenix, AZ, for Plaintiffs.

Eric Bowen Johnson, David T. Barton, Quarles & Brady LLP, Phoenix, AZ, for Defendant.

# MEMORANDUM OPINION AND ORDER REGARDING POST– TRIAL MOTIONS

MARK W. BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .......................................................1027
 A. Factual Background.............................................1027
 B. Procedural Background..........................................1028

II. ASARCO'S MOTION FOR JUDGMENT AS A MATTER OF LAW.............1030
 A. Applicable Standards...........................................1030
 B. Sufficiency Of The Evidence Of Sexual Harassment ......................1031
 1. Arguments of the parties .......................................1031
 2. Analysis ....................................................1032
 C. Sufficiency Of The Evidence Supporting Punitive Damages ................1034
 1. Arguments of the parties .......................................1034
 2. Analysis ....................................................1035
 D. Excessiveness Of The Punitive Damages Award .........................1036
 1. Arguments of the parties .......................................1036
 2. Analysis ....................................................1037
 a. The BMW factors.......................................1037
 i. Reprehensibility...............................1038
 ii. Proportionality................................1038
 iii. Comparison to civil and criminal penalties ..................1044
 b. Additional factors .....................................1045
 c. The due process calculation ..............................1045
 i. The amount of punitive damages to consider .................1045
 ii. Consideration of the pertinent factors ......................1047
 E. Summary .....................................................1050

III. ASARCO'S ALTERNATIVE MOTION FOR NEW TRIAL ...................1050
 A. Applicable Standards...........................................1050
 B. Misleading Supplemental Jury Instruction ...........................1051
 1. Arguments of the parties .......................................1051
 2. Analysis ....................................................1052
 C. Erroneous Admission Of "Me Too" Evidence ..........................1055
 1. Arguments of the parties .......................................1055
 2. Analysis ....................................................1055
 D. Summary .....................................................1056

IV. THE PLAINTIFFS' REQUEST FOR EQUITABLE AND INJUNCTIVE
 RELIEF .........................................................1056

V. CONCLUSION ...................................................1058

The Civil Rights Division of the Arizona Department of Law (ACRD) and individual plaintiff Angela Aguilar, a laborer at a mine operated by defendant ASARCO, L.L.C., alleged claims of hostile work environment sexual harassment and retaliation for complaining about sexual harassment in violation of state and federal law. Aguilar also alleged that she was constructively discharged from her job at the mine by harassment and retaliation. After an eight-day trial, the jury found for the plaintiffs on the sexual harassment claim, but for ASARCO on Aguilar's claim

of retaliation and on her allegations that she had been constructively discharged either as the result of sexual harassment or retaliation. On the plaintiffs' sexual harassment claim, the jury awarded no compensatory damages for past or future emotional distress, and only $1.00 in nominal damages, but $868,750.00 in punitive damages.

This case was exceptionally well tried by all the lawyers. All counsel were superbly prepared. All counsel demonstrated extraordinary trial skills and exceptional zealous advocacy on behalf of their respective clients. More importantly, all of the lawyers, at every turn in the trial, displayed the utmost professionalism to each other, the opposing parties, the jury, and me.

In post-trial motions, the plaintiffs seek injunctive and equitable relief and ASARCO seeks judgment as a matter of law, or, in the alternative, a new trial. ASARCO asserts that neither the sexual harassment claim nor the prayer for punitive damages should have been submitted to the jury, but if I find that they were properly submitted, that the punitive damages award should be reduced, at the very least, to the applicable "cap" of $300,000 under Title VII, if not to $9 or less, on the ground that the punitive damages award is constitutionally excessive. The plaintiffs assert that the sexual harassment claim and prayer for punitive damages were properly submitted and that the punitive damages award should be reduced no lower than the statutory "cap."

## I. INTRODUCTION

### A. Factual Background

Angela Aguilar, the individual plaintiff in this case, was hired as a laborer by defendant ASARCO, L.L.C., at the North Mill of ASARCO's Mission Mine in December 2005. The parties agree that, at trial, the plaintiffs presented evidence of three instances of alleged sexual harassment of Aguilar, although they put very different "spins" on the evidence of these instances.

First, the plaintiffs presented evidence that Aguilar was sexually harassed by her immediate supervisor, Wayne Johnson, shortly after she began working as a car loader at the mine's filter plant on March 19, 2006. The plaintiffs' evidence was that Aguilar fended off Johnson's sexual advances for a couple of weeks, without evident effect, before she complained to the human resources manager, Lupe Gonzalez, but Gonzalez merely "coached" her about how to talk with Johnson. Because the harassment continued, Aguilar complained to Sam Lawrence, the Mission Mill manager on two occasions, but it was not until after she made the second complaint to Lawrence that Johnson stopped harassing her. Thereafter, Johnson not only stopped harassing Aguilar, but ceased speaking to her or training her for her job and complained about her work performance. Aguilar also presented evidence that, just months after Johnson stopped harassing her, he subjected another woman assigned to work with him as a car loader to unwelcome sexual advances. Johnson was not disciplined for his conduct toward either Aguilar or the other woman. ASARCO presented evidence that, in her written notes and her statements to Gonzalez, Aguilar described Johnson as a "perfect gentleman," arguing that this evidence demonstrates that any supposed harassment by Johnson was neither severe nor pervasive. ASARCO also contends that the evidence shows that, after ASARCO took remedial action, Johnson's harassment of Aguilar stopped.

Second, the plaintiffs presented evidence that Aguilar's subsequent supervisor, Julio Esquivel, yelled at her and otherwise

treated her poorly. Although ASARCO presented evidence that Esquivel treated all employees, male. and female, poorly, the plaintiffs contend that the evidence showed that Esquivel treated Aguilar more rudely and roughly than he treated male employees and threatened her with reprimands and termination. Such differential treatment, they contend, included telling Aguilar that "your ass is mine," that he would talk to her more than he talked to his "lady," and that she would have to do everything that he told her to do in the way that he told her to do it, but there is no evidence that he treated male employees in this way. The plaintiffs also contend that they presented evidence that ASARCO failed to investigate Aguilar's complaints about Esquivel's conduct, and instead disciplined her, but suspended Esquivel for ten days without pay when male employees complained about his conduct.

Third, the plaintiffs presented evidence of pornographic graffiti, labeled with Aguilar's name, in the portable toilet that she was forced to use. The parties agree that this pornographic graffiti was eventually painted over, and ASARCO contends that no one other than Aguilar testified to having seen it, while Aguilar herself testified that she saw it on only about five occasions. The plaintiffs contend, however, that the evidence shows that Aguilar had no choice but to use the portable toilet on several occasions, that ASARCO was extremely dismissive of Aguilar's complaints about the pornographic graffiti and, worse, that there were other incidents of pornographic graffiti in restrooms at the mine, both before and after the incident involving Aguilar.

## B. Procedural Background

In this action, the Civil Rights Division of the Arizona Department of Law (ACRD) and Angela Aguilar allege claims of hostile work environment sexual harassment and retaliation for complaining about sexual harassment in violation of state and federal law.[1] I was assigned the trial of this matter as a visiting judge. Although there is no right to a jury trial on the state-law claims, the parties agreed to be bound by the jury's verdict on the state-law claims as to whether or not discrimination or retaliation occurred, leaving only the appropriate equitable relief, if any, on the state-law claims for me to decide post-trial.

A jury trial began on April 4, 2011. At the trial, plaintiff ACRD was represented by Ann Hobart, Litigation Section Chief Counsel, Civil Rights Division, Office of the Attorney General, in Phoenix, Arizona. Plaintiff Angela Aguilar was represented by Sandy Forbes of Waterfall, Economidis, Caldwell, Hanshaw and Villamana P.C., in Tucson, Arizona. Defendant ASARCO, L.L.C., was represented by David T. Barton and Eric B. Johnson of Quarles & Brady L.L.P., in Phoenix, Arizona.

After seven days of evidence, the case was submitted to the jury on April 13, 2011. Late in the afternoon on April 13, 2011, the jurors sent the following note:

Instruction No 5

One through four elements. The word conduct is used. Can this be applied to more than one situation or does it have to apply to all?

Docket no. 328. I circulated a draft response, to which ASARCO agreed, that

---

1. The plaintiffs filed separate actions and plaintiff Aguilar intervened in ACRD's action, all before this case was removed to this federal court. ACRD also asserted a claim of disparate treatment sex discrimination in vio-

lation of state law. Aguilar initially also asserted a claim of intentional infliction of emotional distress, but she voluntarily dismissed that claim.

stated, "The word 'conduct' can apply to more than one situation but each situation must be proved by the greater weight of the evidence." However, after further consultation with the parties, I provided the following answer:

I have received a note signed by a juror, a copy of which is attached.

In response to your note, I state the following:

The word "conduct" can apply to one or more situations.

This instruction should be taken together with the jury instructions I previously gave to you. The instructions must be considered as a whole.

Docket no. 329.

In the early afternoon of April 14, 2011, the jury returned a verdict finding for the plaintiffs on their claim of sexual harassment, finding no constructive discharge on that claim, awarding no compensatory damages for past or future emotional distress, awarding $1.00 for nominal damages, and awarding $868,750.00 for punitive damages. The jury found for ASARCO on the plaintiffs' claim of retaliation for sexual harassment complaints. I entered judgment (docket no. 330) pursuant to the jury's verdict on April 14, 2011.

On April 21, 2011, the ACRD filed Proposed Findings Of Fact And Conclusions Of Law (docket no. 331) pertaining to its claim for hostile work environment sexual harassment pursuant to A.R.S. §§ 41–1463(B) and 1481. On April 21, 2011, the plaintiffs also filed a Joint Supplemental Memorandum Regarding Their Request For Injunctive And Equitable Relief (docket no. 332), and a Notice Re: Equitable Relief Of Back Pay And Reinstatement Or Front Pay (docket no. 333), withdrawing their requests for any such equitable relief. On April 26, 2011, plaintiff Aguilar filed her Motion For Attorney's Fees Pursuant To LRCiv 54.2(b)(1) (docket no. 335).

At ASARCO's request, I held a telephonic conference on post-trial matters on May 3, 2011. *See* Order (docket no. 337). During that conference, it was agreed that ASARCO would file its post-trial motions by May 12, 2011, that oral arguments on both the plaintiffs' and the defendant's post-trial motions would be set during my return visit to Arizona, and that the attorney's fee matter would be addressed separately later. I also advised the parties that the ACRD's proposed findings of fact were unnecessary in this case. After that conference, I set oral arguments on the plaintiffs' joint request for injunctive and equitable relief and on ASARCO's anticipated post-trial motions for June 6, 2011, when I would again be in Arizona as a visiting judge.

On May 12, 2011, ASARCO filed a Response To Plaintiffs' Joint Supplemental Memorandum Regarding Their Request For Injunctive And Equitable Relief (docket no. 339) and a Renewed Motion For Judgment As A Matter Of Law Or In The Alternative Motion For New Trial (docket no. 340). On May 19, 2011, the ACRD filed a Reply In Support Of Plaintiffs' Request For Injunctive And Equitable Relief (docket no. 342), in which Aguilar filed a Joinder (docket no. 343). On May 27, 2011, the plaintiffs filed their Opposition To Defendant's Renewed Motion For Judgment As A Matter Of Law Or In The Alternative Motion For New Trial (docket no. 344). On June 3, 2011, ASARCO filed a Reply (docket no. 345) in further support of its post-trial motions. Also on June 3, 2011, the ACRD filed its Notice Of Withdrawal Of Plaintiff State Of Arizona's Proposed Findings Of Fact And Conclusions Of Law (docket no. 346).

At the oral arguments on June 6, 2011, on the post-trial motions, plaintiff ACRD was again represented by Ann Hobart,

plaintiff Aguilar was again represented by Sandy Forbes, and defendant ASARCO was again represented by David T. Barton and Eric B. Johnson. The oral arguments, like the other briefing and arguments in this case, were spirited, thorough, and enlightening. At the conclusion of the oral arguments, I authorized the parties to submit post-argument briefs on the impact of *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir.2003), on analysis of punitive damages in this case. Plaintiff Aguilar filed such a Supplemental Memorandum (docket no. 351) on June 16, 2011, and defendant ASARCO filed its Memorandum Re *Zhang v. American Gem Seafoods, Inc.* (docket no. 353) on June 21, 2011.

The post-trial motions are now fully submitted.

The parties initially agreed that I should delay my ruling on post-trial motions until after they held a mediation at the end of July 2011. However, in response to further inquiries from me, the parties agreed that a ruling prior to their mediation session might facilitate the mediation. Therefore, I now enter this ruling on the post-trial motions.

There will be no need for me to reach the plaintiffs' request for equitable and injunctive relief if I grant ASARCO's motion for judgment as a matter of law or its alternative motion for new trial. Therefore, I will begin my legal analysis with ASARCO's post-trial motions.

## II. ASARCO'S MOTION FOR JUDGMENT AS A MATTER OF LAW

ASARCO's motion for judgment as a matter of law has three prongs: (1) there

was insufficient evidence of hostile environment sexual harassment even to submit that claim to the jury; (2) punitive damages were not warranted as a matter of law; and (3) the jury's punitive damages award is excessive as a matter of law. I will consider each of these contentions in turn. First, however, I will address the standards applicable to a Rule 50(b) motion for judgment as a matter of law.

### A. Applicable Standards

Rule 50(b) of the Federal Rules of Civil Procedure provides for post-trial renewal of a motion for judgment as a matter of law pursuant to Rule 50(a) made before the case was submitted to the jury, as occurred here.[2] Although the Rule provides that the court may "allow judgment on the verdict, if the jury returned a verdict," "order a new trial," or "direct the entry of judgment as a matter of law," FED.R.CIV.P. 50(b)(1)-(3), it does not state the standards applicable to granting or denying such relief. The Ninth Circuit Court of Appeals has filled this gap, explaining that "[a] grant of such a motion is proper if the evidence, construed in favor of the nonmoving party, permits only one reasonable conclusion," and that conclusion is contrary to the verdict. *Art Attacks Ink, L.L.C. v. MGA Entertainment, Inc.*, 581 F.3d 1138, 1143 (9th Cir.2009) (citing *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir.2002)); *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir.2009). More specifically still, " 'in entertaining a motion for judgment as a matter of law, the court ... may not make credibility determinations or weigh the evidence.' " *Go Daddy Software, Inc.*, 581 F.3d at 961

---

**2.** Such a motion "may include an alternative or joint request for a new trial under Rule 59," FED.R.CIV.P. 50(b), and ASARCO included such an alternative motion. There is no assertion here that ASARCO's Rule 50(b) motion fails to comply with any of the procedural requirements of such a motion. *See, e.g., EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir.2009).

(quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Thus, " '[the court] must view the evidence in the light most favorable to the nonmoving party ... and draw all reasonable inferences in that party's favor.' " *Id.* (quoting *Josephs v. Pacific Bell,* 443 F.3d 1050, 1062 (9th Cir.2006)). Thus, the question is whether there is "substantial evidence" supporting the jury's verdict. *Id.* The Ninth Circuit Court of Appeals reviews *de novo* renewed motions for judgment as a matter of law, such as the one now before the court. *Art Attacks Ink,* 581 F.3d at 1143; *Go Daddy Software, Inc.,* 581 F.3d at 961.

## B. Sufficiency Of The Evidence Of Sexual Harassment

### 1. Arguments of the parties

ASARCO argues that the plaintiffs failed to establish a sexually hostile work environment, as a matter of law, because none of the isolated incidents on which their claim relies meets the exacting standards for proof of a hostile environment claim. ASARCO argues that the incidents involving Wayne Johnson were mild and, even assuming that they amounted to harassment, it is undisputed that ASARCO took prompt remedial action that, according to Aguilar's own testimony, effectively ended the alleged harassment. ASARCO argues that the incident involving Julio Esquivel cannot even be shown to be because of Aguilar's sex, because Esquivel treated everyone, male and female, poorly. ASARCO argues that, even supposing Esquivel treated women differently than he treated men, merely yelling at female employees and other personality conflicts are not sufficient to raise a claim of sexual harassment that could go to the jury. As to the bathroom graffiti incident, ASARCO argues that Aguilar's limited exposure to offensive graffiti during a brief period does not establish sufficiently severe or pervasive harassment as a matter of law.

The plaintiffs argue that the evidence shows not only that the harassment was because of Aguilar's sex, but that it was sufficiently severe and pervasive to be actionable and to support the jury's verdict. They contend that ASARCO's arguments are based on very selective descriptions of the pertinent evidence. First, as to harassment by Wayne Johnson, the plaintiffs argue that the evidence shows that Aguilar had to fend off Johnson's sexual advances for a couple of weeks. The plaintiffs also argue that ASARCO is flat wrong to assert that ASARCO took prompt remedial action in response to that harassment or that whatever action it took ended that harassment. Instead, they argue that the human resources manager, Gonzalez, did nothing effective in response to Aguilar's first complaint, and that it was only after she made two complaints to the mill manager, Lawrence, that any action was taken. Even that action, they argue, only caused Johnson to stop speaking to Aguilar or training her—another form of harassment—and did not stop him from subsequently harassing another woman assigned to work with him as a car loader with unwelcome sexual advances. They also argue that the evidence shows that Esquivel did subject Aguilar to harassment that was different from his general rudeness to male and female workers, including the "your ass is mine" comment mentioned above. They contend that each of the cases on which ASARCO relies to show that this harassment was insufficient is distinguishable. Finally, as to the bathroom graffiti incident, the plaintiffs argue that the evidence shows that Aguilar was forced to use the bathroom in question for a period of time and that ASARCO treated her complaints about the graffiti dismissively. As to this incident, the plaintiffs

again assert that the cases cited by ASAR-CO provide no useful comparisons.

In reply, ASARCO argues that Aguilar testified that she has only recently been able to tell her husband and attorneys that Johnson groped her and propositioned her for sex. Thus, in ASARCO's view, there is no evidence to corroborate her claim that she made any complaint to management about anything other than being asked out and complimented on her looks. ASARCO also argues that Aguilar admitted at trial that none of Esquivel's comments were disparaging or demeaning comments about women, just complaints about her work performance. Finally, ASARCO argues that Aguilar was unable to provide a coherent timeline as to when the graffiti appeared and when it was painted over, she saw it only a few times, and no one other than Aguilar testified to having seen the graffiti before it was painted over.

At oral arguments, ASARCO admitted that it has no case standing for the proposition that each individual situation relied upon by a sexual harassment plaintiff had to constitute sexual harassment, standing alone, for the plaintiffs to prevail. Nevertheless, ASARCO argues that, unless each incident at least arguably constituted actionable harassment, ASARCO never had notice of sexual harassment to which it could have responded. ASARCO also argues that cases involving the totality of the circumstances involved incidents related either by actor, or time and space, or situations, or circumstances. Here, ASARCO argues, there are three distinct incidents of alleged harassment, so that a "totality of the circumstances" analysis is inappropriate.

### 2. Analysis

■ As the Ninth Circuit Court of Appeals recently explained,

A plaintiff may establish a sex hostile work environment claim by showing that he was subjected to verbal or physical harassment that was sexual in nature, that the harassment was unwelcome and that the harassment was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *See Gregory v. Widnall,* 153 F.3d 1071, 1074 (9th Cir.1998). A plaintiff must establish that the conduct at issue was both objectively and subjectively offensive: he must show that a reasonable person would find the work environment to be "hostile or abusive," and that he in fact did perceive it to be so. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

*Dawson v. Entek Int'l,* 630 F.3d 928, 937–38 (9th Cir.2011); *EEOC v. Prospect Airport Servs., Inc.,* 621 F.3d 991, 997 (9th Cir.2010). As the Supreme Court has recognized, the " 'critical issue' " in determining whether harassment was "because of sex" is " 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.' " *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "Whether a working environment is objectively 'abusive' 'can be determined only by looking at all the circumstances,' which 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.... [N]o single factor is required.' " *Prospect Airport Servs.,* 621 F.3d at 999 (quoting *Harris,* 510 U.S. at 23, 114 S.Ct. 367). " '[T]he required showing of severity or seriousness of the harassing

conduct varies inversely with the pervasiveness or frequency of the conduct.' " *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir.2000) (quoting *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir.1991), in turn citing *King v. Board of Regents*, 898 F.2d 533, 537 (7th Cir.1990)).

ASARCO cites authority for the proposition that "isolated incidents" of alleged sex-based conduct may not create a hostile work environment, *see, e.g., Candelore v. Clark County Sanitation Dist.*, 975 F.2d 588, 590 (9th Cir.1992) (stating that "isolated incidents of sexual horseplay" did not create a hostile work environment), but no authority for the proposition that each "isolated incident" on which a plaintiff's claim of sexual harassment is based must individually constitute actionable harassment. Indeed, that proposition is contrary to long-standing precedent. As the Ninth Circuit Court of Appeals has reiterated, "[w]hether a working environment is objectively 'abusive' 'can be determined *only by looking at all the circumstances.*' " *Prospect Airport Servs., Inc.*, 621 F.3d at 999 (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367) (emphasis added). Thus, the jury was entitled to consider whether or not the environment was hostile on the basis of *all* of the situations alleged, not just whether the various incidents of alleged harassment, individually, were sufficiently severe.

Similarly, I have found no authority for the proposition that incidents must somehow be "related" to be considered under a "totality of the circumstances" standard. Such a "relatedness" requirement would seriously undermine the effectiveness of the antidiscrimination laws, as it would allow a plaintiff to be subjected to serial, but "distinct" harassment—for example, while transferring through several departments of a single employer—without recourse, even though "looking at all the circumstances," the plaintiff was subjected to frequent, humiliating conduct that interfered with the plaintiff's work performance and, moreover, that showed a "culture" of harassment at that employer.

Finally, I have found no case law supporting the proposition that an employer must only respond to a complaint of *actionable* harassment; rather, the question is whether the employer responded adequately to *alleged* harassment. *See, e.g., Dawson*, 630 F.3d at 938 ("Where an employee is allegedly harassed by co-workers, the employer may be liable if it knows or should know of the harassment but fails to take steps "reasonably calculated to end the harassment." (internal quotation marks and citations omitted)"). Moreover, "an employer must intervene promptly," in a manner that not only stops the harasser, but persuades other potential harassers to refrain from unlawful conduct. *See id.* at 940. If an employer is allowed to wait until it deems the alleged harassment is sufficient to be actionable before responding, the promptness and effectiveness of any response would be undermined.

■ ASARCO's assertion that the evidence is inadequate to support a claim that Aguilar was subjected to a sexually hostile environment is, as the plaintiffs contend, also based on a selective view of the evidence or a weighing of the evidence that cannot be the basis for my review on a Rule 50(b) motion. *Go Daddy Software, Inc.*, 581 F.3d at 961. Instead, viewing the evidence in the light most favorable to the plaintiffs, I cannot say that the evidence "permits only one reasonable conclusion" that is contrary to the verdict. *Art Attacks Ink, L.L.C.*, 581 F.3d at 1143; *Go Daddy Software, Inc.*, 581 F.3d at 961. The harassment by Johnson and the harassment in the form of pornographic graffiti were undisputably because of Aguilar's sex in light of Johnson's sexual ad-

vances and the nature of the graffiti. *See Oncale,* 523 U.S. at 81, 118 S.Ct. 998. Moreover, the plaintiffs have pointed to evidence raising reasonable inferences that, even if Esquivel treated all male and female employees poorly, he nevertheless subjected Aguilar to treatment to which he did not or would not subject male employees. *Id.* I also believe that a reasonable juror could conclude from the evidence that the instances of harassment were sufficiently frequent to demonstrate a pervasive atmosphere of sexual harassment, such that even the relatively less severe conduct at issue in each incident here, when taken together, met the threshold of prohibited harassment. *Brooks,* 229 F.3d at 926; *see also Prospect Airport Servs., Inc.,* 621 F.3d at 999 (reiterating that whether a working environment is objectively abusive "can be determined only by looking at all the circumstances") (internal quotation marks and citations omitted).

Therefore, ASARCO's motion for judgment as a matter of law on the plaintiffs' sexually hostile environment claim will be denied.

### C. Sufficiency Of The Evidence Supporting Punitive Damages

#### 1. Arguments of the parties

Next, ASARCO contends that, even if the sexually hostile environment claim was submissible, the prayer for punitive damages was not. ASARCO argues that there is no evidence that ASARCO intended to injure Aguilar or acted in the face of a perceived risk of violating antidiscrimination laws. Instead, ASARCO argues, again, that it took prompt action to address Aguilar's claim of harassment by Johnson, moved her to a different crew when she complained about Esquivel's conduct, and painted over the bathroom graffiti. Clearly, ASARCO argues, whatever action some employees may have taken to

offend Aguilar, ASARCO as a company took effective action to protect her Title VII rights, and there is no evidence that ASARCO condoned or approved any of the alleged conduct. ASARCO argues that courts have refused to award punitive damages in cases involving far more egregious conduct.

The plaintiffs assert that there was more than enough evidence to submit punitive damages to the jury. They argue that the evidence shows that ASARCO was recklessly indifferent to the harassment and discrimination Aguilar suffered during her employment, starting with her complaints to human resources and management about Johnson's behavior, continuing through the bathroom graffiti and her complaints to management, and on through her complaints to human resources and management about Esquivel. The plaintiffs argue that the people to whom Aguilar was supposed to direct her complaints according to ASARCO's sexual harassment policy, *see* Plaintiffs' Exhibit 50, failed to treat her complaints seriously or to investigate those complaints adequately. The plaintiffs also argue that the evidence shows that the managers who were aware of ASARCO's written policy requiring investigation of all harassment complaints simply ignored their responsibilities when Aguilar complained and that there was no training for supervisory personnel about responding to complaints of harassment.

In reply, ASARCO reiterates its contention that the plaintiffs failed to present evidence sufficient to justify punitive damages. Specifically, ASARCO argues that there is no evidence to support a finding of reckless indifference, because ASARCO responded effectively to each of Aguilar's complaints of sexual harassment.

### 2. Analysis

Whether or not punitive damages should have been submitted is also reviewed under the "sufficiency of the evidence" standard. *Bains, L.L.C. v. Arco Prods. Co., Div. of Atlantic Richfield Co.,* 405 F.3d 764, 774 (9th Cir.2005). Thus, once again, "[t]he test is whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Id.* (internal quotation marks and citations omitted); *accord Art Attacks Ink, L.L.C.,* 581 F.3d at 1143; *Go Daddy Software, Inc.,* 581 F.3d at 961

 The Ninth Circuit Court of Appeals has explained the standards for an award of punitive damages in a Title VII case, as follows:

> [W]e note that Title VII provides for punitive damages, which may be awarded "if the complaining party demonstrates that the respondent engaged in a discriminatory practice ... with *malice or with reckless indifference* to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1) (emphasis added). To award punitive damages, the individuals' conduct must have been more than just intentional discrimination—instead they must have known they were acting in violation of federal law. *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 535–36, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); *see also Ngo v. Reno Hilton Resort Corp.,* 140 F.3d 1299, 1304 (9th Cir.1998) ("Punitive damages may not be awarded ... where a defendant's discriminatory conduct is merely 'negligent in respect to the existence of a federally protected right.'" (quoting *Hernandez–Tirado v. Artau,* 874 F.2d 866, 870 (1st Cir.1989))).

*Elsayed Mukhtar v. California State Univ., Hayward,* 299 F.3d 1053, 1068 n. 15 (9th Cir.2002); *Hemmings v. Tidyman's, Inc.,* 285 F.3d 1174, 1197 (9th Cir.2002) (explaining that the plaintiff does not have to prove that the defendant acted "egregiously" (citing *Kolstad,* 527 U.S. at 534–35, 119 S.Ct. 2118)). "The defendant is appropriately subject to punitive damages if it acts 'in the face of a perceived risk that its actions will violate federal law.'" *Hemmings,* 285 F.3d at 1197 (quoting *Kolstad,* 527 U.S. at 536, 119 S.Ct. 2118). As the Ninth Circuit Court of Appeals has noted, "A written antidiscrimination policy does not insulate a company from liability [for punitive damages] if it does not enforce the antidiscrimination policy and, by its actions, supports discrimination." *Bains,* 405 F.3d at 774 (citing *Swinton v. Potomac Corp.,* 270 F.3d 794, 810–11 (9th Cir.2001)).

 Again, I cannot say that the evidence in this case, construed in the light most favorable to the plaintiffs, permits only one reasonable conclusion, that punitive damages were not available as a matter of law. *Bains,* 405 F.3d at 774 (stating the standard for review for submission of punitive damages); *accord Art Attacks Ink, L.L.C.,* 581 F.3d at 1143; *Go Daddy Software, Inc.,* 581 F.3d at 961. There is no dispute that ASARCO *had* an antidiscrimination policy. However, the plaintiffs have pointed to evidence that, despite having such a policy, ASARCO's managerial and human resources personnel did not provide prompt and effective remedial action, but treated Aguilar's claims dismissively, did nothing to investigate Aguilar's claims, or took steps that were not reasonably calculated to and did not stop the harassment. Having a policy alone is not enough to escape liability for punitive damages. *Bains,* 405 F.3d at 774. Indeed, evidence that such a policy existed, but was not followed, gives rise to a reasonable inference that ASARCO perceived a risk

that its actions violated federal law and acted in reckless indifference to whether or not its conduct violated antidiscrimination laws. *See Elsayed Mukhtar,* 299 F.3d at 1068 n. 15; *Hemmings,* 285 F.3d at 1197.

ASARCO is not entitled to judgment as a matter of law that punitive damages were not warranted in this case.

## D. Excessiveness Of The Punitive Damages Award

ASARCO's final ground for judgment as a matter of law is that, even if the sexual harassment claim and the punitive damages prayer were submissible, the amount of punitive damages awarded by the jury was both in excess of the statutory cap for Title VII punitive damages and so excessive that it violates due process. The plaintiffs concede that the award exceeded the statutory "cap," but contend that a punitive damages award of $300,000, at the statutory "cap," is not unconstitutionally excessive.

### 1. Arguments of the parties

ASARCO asserts that the Supreme Court has announced that, in practice, few awards exceeding a single-digit ratio between punitive damages and compensatory damages, to a significant degree, will satisfy due process. ASARCO acknowledges that an exception to this rule is where a particularly egregious act has resulted in only a small amount of economic damages. ASARCO argues that this is not such a case. Moreover, ASARCO argues that, considering the factors pertinent to the determination of the appropriate amount of a punitive damages award, no more than $9 in punitive damages should be awarded in this case.

Somewhat more specifically, ASARCO argues that there is, at best, little evidence of "reprehensibility" of its conduct. AS-ARCO argues that there was no evidence

at trial that it acted with malice, and that the plaintiffs argued only that ASARCO was indifferent to Aguilar's complaints. ASARCO reiterates its argument that it took prompt and adequate steps in response to Aguilar's complaints. ASARCO also asserts that there is an untenable disparity between the actual harm Aguilar purportedly suffered and the punitive damages awarded. ASARCO asserts that the jury's rejection of Aguilar's prayer for emotional distress damages and her allegation that she was constructively discharged, which would have opened the door to backpay or frontpay, demonstrates that Aguilar did not suffer *any* harm as a result of ASARCO's alleged misconduct. As to the difference between the punitive damages award and civil penalties, ASAR-CO argues that discrimination cases ordinarily involve a single-digit ratio between punitive damages and actual damages. Finally, ASARCO argues that the jury impermissibly punished ASARCO for alleged harm to others, because this is the only explanation for the verdict in this case. If the punitive damages award had been based on conduct toward Aguilar, ASAR-CO argues, the jury would have awarded her compensatory damages. ASARCO argues that harm suffered by other employees who were subjected to pornographic graffiti, specifically, Esquivel and Miller, cannot support a punitive damages award for Aguilar.

The plaintiffs take a very different view of the amount of punitive damages that the evidence would support. They argue that courts have recognized the difficulty of addressing the "proportionality" issue in cases that involve only nominal or low compensatory damages. They note that at least one federal appellate court has recognized that the punitive damages-to-compensatory damages ratio analysis cannot be applied effectively to nominal damages,

because nominal damages are often awarded to vindicate constitutional or statutory rights, and the proportionality analysis would defeat any award of punitive damages at all in such cases. They note that another federal appellate court has recognized that the combination of the statutory cap and the high threshold of culpability for awards of punitive damages in Title VII cases confines the punitive damages award to a constitutionally tolerable proportion. They contend that, while the Ninth Circuit Court of Appeals has not yet gone quite so far, it has recognized that the statutory cap serves as a restraint on the permissible amount of punitive damages, and has, in fact, concluded that the statutory cap for Title VII cases suggested a comparator for a punitive damages award in a § 1981 case in which only nominal damages had been awarded. Moreover, they contend that another Circuit Court of Appeals has upheld a punitive damages award at the statutory cap in a Title VII case, where only $1 in nominal damages had been awarded.

Turning to other factors pertinent to a determination of the amount of a punitive damages award, the plaintiffs argue that ASARCO's conduct was sufficiently reprehensible to sustain a punitive damages award at the statutory cap of $300,000. They point out that the harm that Aguilar suffered from harassment was at least partially physical in nature, because Johnson touched her, the graffiti urged sexual penetration of her, and Esquivel intimidated her physically with his voice and gestures. The plaintiffs also contend that Aguilar was forced to tolerate the three phases of harassment, because she was economically vulnerable. Moreover, the plaintiffs argue that ASARCO demonstrated its reckless disregard of Aguilar's rights in its dismissive and ineffective treatment of her complaints. They also argue that an award of $300,000, the statutory cap, is consistent

with the Supreme Court's direction to consider civil penalties in comparable cases.

In reply, ASARCO argues that courts have reduced punitive damages awards well below the applicable cap in cases involving conduct far more egregious than the plaintiffs have established. ASARCO argues in its reply brief that the decision of the Ninth Circuit Court of Appeals in *Mendez v. County of San Bernardino,* 540 F.3d 1109 (9th Cir.2008), in which the court affirmed a reduction of a punitive damages award from $250,000 to $2,500 for each claim on which the plaintiff had been awarded only $1 in nominal damages, is "directly on point." However, ASARCO argues that, because this is not a case involving egregious conduct that resulted in only limited harm, if punitive damages are available at all, they should not exceed $9.

#### 2. Analysis

■ The Ninth Circuit Court of Appeals reviews *de novo* a district court's determination of whether or not a punitive damages award is excessive. *Mendez v. County of San Bernardino,* 540 F.3d 1109, 1120 (9th Cir.2008) (adding that pertinent findings of fact are reversed only if they are clearly erroneous); *Bains,* 405 F.3d at 775. Several factors are pertinent in the excessiveness analysis.

#### a. The BMW factors

■ The "guideposts" ordinarily considered to determine whether or not a punitive damages award is excessive, established by the Supreme Court in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)— and, hence, often called the *BMW* factors or the *Gore* factors—are the following: "(1) the degree of reprehensibility, (2) the disparity between the harm suffered and

the punitive damages award, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Bains,* 405 F.3d at 775 (citing *BMW,* 517 U.S. at 574–75, 116 S.Ct. 1589); *accord Mendez,* 540 F.3d at 1120. However, "that one *BMW* guidepost may indicate that a particular award raises *BMW*-type concerns does not prove that award to be constitutionally excessive." *Zhang v. American Gem Seafoods, Inc.,* 339 F.3d 1020, 1045 (9th Cir.2003). These *BMW* factors require some further explanation.

**i. Reprehensibility.** As to the first BMW factor, "reprehensibility," the Ninth Circuit Court of Appeals has explained that the court should consider the following: "whether 'the harm caused was physical as opposed to economic; [whether] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [whether] the target of the conduct had financial vulnerability; [whether] the conduct involved repeated actions or was an isolated incident; and [whether] the harm was the result of intentional malice, trickery, or deceit, or mere accident.'" *Bains,* 405 F.3d at 775 (quoting *State Farm,* 538 U.S. at 419, 123 S.Ct. 1513); *accord Mendez,* 540 F.3d at 1120 (also quoting *State Farm* ). While the lack of any threat of physical harm reduces reprehensibility, conduct that is not isolated but repeated, that targets highly vulnerable people financially, and that causes harm resulting from intentional malicious conduct does suggest reprehensibility. *Id.* So, too, does intentional, repeated ethnic harassment, *id.,* and I presume that the Ninth Circuit Court of Appeals would reach the same conclusion as to repeated sexual harassment. Furthermore, failure to remedy or even address discriminatory conduct or the effects of discrimination might reasonably lead ju-

rors to conclude that punitive damages were necessary to prevent future discrimination. *Id.*

**ii. Proportionality.** The second BMW factor, the ratio between the punitive damages and the actual harm, is " 'perhaps [the] most commonly cited indicium of an unreasonable or excessive punitive damages award.' " *Zhang,* 339 F.3d at 1044 (quoting *BMW,* 517 U.S. at 580–81, 116 S.Ct. 1589). This factor is generally analyzed by comparing punitive and compensatory damages. *Id.* More specifically,

> The Court has refused to give a precise mathematical guideline for the "constitutionally acceptable range," but the two cases in which the Court struck down punitive damages awards both involved rather large ratios of punitive to compensatory damages: in *BMW,* the ratio was a "breathtaking 500 to 1," *id.;* in *State Farm,* the ratio was 145 to one, 538 U.S. at 424, 123 S.Ct. at 1524. Likewise, in *Cooper Industries* [*Inc. v. Leatherman Tool Group, Inc.*], where the Court questioned the size of the award but declined to rule on its constitutionality, the ratio was ninety to one. 532 U.S. [424] at 429, 121 S.Ct. 1678, 149 L.Ed.2d 674.

Despite its refusal to establish a firm numerical limit to the ratio, the *BMW* Court noted that precedent "suggested that the relevant ratio was not more than 10 to 1," 517 U.S. at 559, 116 S.Ct. 1589. In *State Farm,* the Court "decline[d] again to impose a brightline ratio which a punitive damage award cannot exceed," 538 U.S. at [425], 123 S.Ct. at 1524, but offered similar guidance on the general limits to an acceptable ratio: "[I]n practice, few awards exceeding a single-digit ratio ... will satisfy due process." *Id.* "Single-digit multipliers are more likely to comport with due

process" than the extreme ratios found in *BMW* or *State Farm. Id.*

*Zhang*, 339 F.3d at 1044.

The plaintiffs assert that some courts have recognized that this "proportionality" or "disparity" factor is not as relevant in a case in which *nominal* damages, rather than compensatory damages, have been awarded. For example, in *Williams v. Kaufman County*, 352 F.3d 994 (5th Cir. 2003), a § 1983 case by detainees against a county sheriff and the county for violation of the detainees' civil rights during the execution of a search warrant, the Fifth Circuit Court of Appeals stated that "any punitive damages-to-*compensatory* damages 'ratio analysis' cannot be applied effectively in cases where only *nominal* damages have been awarded," because "strict proportionality would defeat the ability to award punitive damages at all" in actions, for example, seeking vindication of constitutional rights, the kind of case in which nominal damages are most likely. *Id.* at 1016 (emphasis in the original). Therefore, that court upheld the district court's award, after a bench trial, of $100 in "nominal damages" and $15,000 in punitive damages per plaintiff, a 150:1 ratio. *Id.*

A few years later, in *Abner v. Kansas City Southern R. Co.*, 513 F.3d 154 (5th Cir.2008), a Title VII and § 1981 racially hostile environment case, the Fifth Circuit Court of Appeals again affirmed a jury award of no compensatory damages, but $125,000 in punitive damages for each plaintiff. The court first held, in pertinent part, "that a punitive damages award under Title VII and § 1981 need not be accompanied by compensatory damages." *Id.* at 160. The court "base[d] [its] holding on the language of the statute, its provision of a cap, and the purpose of punitive damages under Title VII." *Id.* Among other rationales, the court agreed with the assessment of the Second Circuit Court of Appeals that " 'there is some unseemliness for a defendant who engages in malicious or reckless violations of legal duty to escape either the punitive or deterrent goal of punitive damages merely because either good fortune or a plaintiff's unusual strength or resilience protected the plaintiff from suffering harm.' " *Id.* at 163–64 (quoting *Cush–Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2d Cir.2001)).[3] The court then rejected the defendant's argument that the award was unconstitutionally excessive:

> As we see it, the combination of the statutory cap and high threshold of culpability for any award confines the amount of the award to a level tolerated by due process. Given that Congress has effectively set the tolerable proportion, the three-factor *Gore* analysis is relevant only if the statutory cap itself offends due process. It does not and, as we have found in punitive damages cases

---

**3.** In *Cush–Crawford v. Adchem Corp.*, 271 F.3d 352 (2d Cir.2001), the Second Circuit Court of Appeals upheld an award of $100,000 in punitive damages, the statutory cap based on the number of the defendant's employees, in a Title VII case, even though the jury had awarded the plaintiff *no* compensatory or nominal damages. *Id.* at 357– 58. The court held, first, that "[a]n award of actual or nominal damages is not a prerequisite for an award of punitive damages in Title VII cases." *Id.* at 357. The court then held "that in Title VII cases, where the fact-

finder has found in a plaintiff's favor that the defendant engaged in the prohibited discrimination, punitive damages may be awarded within the limits of the statutory caps if the defendant has been shown to have acted with a state of mind that makes punitive damages appropriate, regardless whether the plaintiff also receives an award of compensatory or nominal damages." *Id.* at 359. However, the court did not address the question of whether the punitive damages award was unconstitutionally excessive.

with accompanying nominal damages, a ratio-based inquiry becomes irrelevant. [*Williams*, 352 F.3d at 1016.] Accepting this analysis makes the sufficiency of evidence to support the statutory threshold a determinant of constitutional validity.

*Abner*, 513 F.3d at 164 (footnote omitted). Because the court found no evidentiary deficiency for the award of punitive damages, the court affirmed the award of $125,000 in punitive damages to each plaintiff. *Id.* at 165.

Similarly, in *Kemp v. American Tel. & Tel. Co.*, 393 F.3d 1354 (11th Cir.2004), a RICO case in which the plaintiff received $115.05 in actual damages and $1 million in punitive damages, the Eleventh Circuit Court of Appeals rejected application of a "single-digit ratio" and reduced the punitive damages award only to $250,000, resulting in a ratio of approximately 2,173:1. *Id.* at 1365. The court reasoned as follows:

[A]s the Supreme Court has explained, in some situations a higher ratio may be appropriate where a "particularly egregious act has resulted in only a small amount of economic damages." [*BMW*, 517 U.S. at 582, 116 S.Ct. 1589] (internal quotation marks omitted). Given the small amount of economic damages in this case, the district court believed that AT & T's conduct fell within this exception, since the company's conduct was deceitful, involved repeated illegal acts, and targeted the financially vulnerable.

We agree with the district court that a mechanical application of the Supreme Court's single-digit multiplier formula would not adequately take account of the seriousness of AT & T's misconduct. In *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320 (11th Cir.1999), we upheld a punitive award of $4.35 million dollars, which was around 100 times the amount of actual damages awarded by the jury, because this amount was "justified by the need to deter this and other large organizations from a 'pollute and pay' environmental policy." 170 F.3d at 1339. We noted that the defendant in *Johansen* was "a large and extremely wealthy international corporation" and that sometimes a "bigger award is needed to attract the … attention of a large corporation" in order to promote deterrence effectively. *Id.* at 1338 (internal quotation marks omitted). We later explained that the result in *Johansen* was motivated by the recognition that "the combination of a small damages award and a strong state interest in deterrence of a particular wrongful act may justify 'ratios higher than might otherwise be acceptable.'" *W & O, Inc.*, 213 F.3d at 616 (quoting *Johansen*, 170 F.3d at 1338).

Like the state interest at issue in *Johansen*, Georgia's interest in deterring fraud and illegal gambling also justifies a ratio "higher than might otherwise be acceptable." *Johansen*, 170 F.3d at 1338. Reducing the jury's award to an amount not significantly larger than nine times the actual damages awarded in this case would mean that AT & T would receive a sanction of little more than a thousand dollars. Such an amount, levied against a company as large as AT & T, would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter. *See Gore*, 517 U.S. at 568, 116 S.Ct. 1589 ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."). Therefore, we agree with the district court that this case falls within the exception articulated in *Gore*.

*Kemp*, 393 F.3d at 1363–64 (footnote omitted).

In *EEOC v. Harbert–Yeargin*, 266 F.3d 498 (6th Cir.2001), a Title VII sexual harassment case, Judge Gilman of the Sixth Circuit Court of Appeals embraced exceptions to the single-digit-ratio rule of thumb, as to the claim of one of the plaintiffs, Carlton, who was awarded $1 in nominal damages, but $300,000, the statutory cap, in punitive damages.[4] Judge Gilman explained:

> In *BMW* ... the Supreme Court expressly pointed out that low compensatory damages does not preclude a large punitive damage award "if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which ... the monetary value of the noneconomic harm might have been difficult to determine." [*BMW*, 517 U.S.] at 582, 116 S.Ct. 1589. The essence of this guidepost is to "require[ ] a court to ask whether a relatively higher ratio of punitive to compensatory damages is permissible in order to effect the deterrent purposes behind punitive damages." *W & O*, 213 F.3d at 616.
>
> A large punitive-to-compensatory-damages-award ratio is justified in the case before us in order to support the deterrent purpose of Title VII. As pointed out in Carlton's brief, he suffered a "physical assault for which no punishment was meted out. In addition, he was subjected to continuous harassment that supervisors encouraged or condoned." Although the economically compensable value of Carlton's injuries might have been small, the egregiousness of the acts suffered by Carlton—unwanted physical intrusion in his genital area—was great enough to support a much higher ratio so as to ensure that such conduct does not occur in the future. *See Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1273 (10th Cir.2000) (stating that "where the injury is primarily personal, a greater ratio may be appropriate").
>
> Furthermore, "[i]n determining the amount and effectiveness of exemplary damages to be awarded against a defendant, the court may take into consideration the defendant's wealth or net worth." *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1119 (2d Cir.1986). The jury in the present case was made aware that Harbert–Yeargin is part of a global corporation, Raytheon Co., with a net worth of $11.8 billion at the time of the trial. In light of the defendant's net worth, a higher punitive-to-compensatory-damages-award ratio is justified in order to serve Title VII's purpose of punishment and deterrence, because a smaller award would have had much less of an effect on a corporation of Harbert–Yeargin's size. As the trial court stated, "even considering the amount of the fine only, a penalty of $300,000.00 for a corporation worth nearly 12 billion is comparable to a $3,000.00 fine for an individual." Accordingly, I would hold that the amount

---

4. That was not the holding of the court, however, contrary to the plaintiffs' characterization of this opinion. This portion of Judge Gilman's opinion was not joined by either of the other members of the panel, who would have reversed denial of judgment as a matter of law on plaintiff Carlton's sexual harassment claim. *See Harbert–Yeargin*, 266 F.3d at 523 n. 7. Those judges affirmed the award of $1 in nominal damages and $50,000 in punitive damages to another plaintiff, noting only, "The punitive damages, if considered apart from the question of whether the plaintiff should have prevailed at all, are understandable since the employer did a very poor job of trying to correct a bad workplace situation of which it had knowledge." *Id.* at 521 n. 5.

of punitive damages awarded to Carlton was supported by the second part of the *BMW* analysis.

*Harbert–Yeargin, Inc.*, 266 F.3d at 515–16 (Gilman, J., writing for himself).

Although the plaintiffs read *Bains* to suggest that the Ninth Circuit Court of Appeals would also tolerate a punitive damages award in the hundreds of thousands of dollars following a nominal damages award, I am not convinced that *Bains* stands for that proposition. Rather, in *Bains*, the court noted that, where the jury awarded one dollar in nominal damages for discrimination on a § 1981 claim and $50,000 in compensatory damages for breach of contract, and the conduct involved in the two claims was intertwined, $50,000 was "the harm suffered." *Bains*, 405 F.3d at 776. Thus, the court performed its "proportionality" analysis by comparing the $5 million punitive damages award by the jury to the $50,000 compensatory damages award, not to the $1 nominal damages award, standing alone. *Id.*

A case that more clearly signals the inclination of the Ninth Circuit Court of Appeals to depart from a strict single-digit "proportionality" analysis in a nominal damages case is actually one cited by ASARCO, *Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir.2008). *Mendez* was a case involving claims of violation of civil rights pursuant to § 1983 arising from an allegedly illegal arrest and unconstitutional search. In *Mendez*, the court upheld the district court's reduction of a $250,000 punitive damages award on two claims, following an award of $1 of nominal damages on each claim, but the reduction was to $2,500 on each claim, for a total of $5,000, not to $18, the amount that the defendants in that case asserted represented the proper ratio. *Id.* at 1121–22. The court explained,

Under the second *Gore* guidepost, we look to the ratio between the punitive damages and the actual harm inflicted on the plaintiff. 517 U.S. at 580, 116 S.Ct. 1589. In this case, because Mendez was awarded only nominal damages, the award of $250,000 in punitive damages—which represents a ratio of 125,000 to one—is obviously considerably in excess of the single-digit ratios the Court has deemed "more likely to comport with due process" than higher ratios. *See State Farm*, 538 U.S. at 425, 123 S.Ct. 1513. The Court, however, has carved out an exception relevant to this case, which is that "ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *Id.* (internal quotation marks omitted). Constitutional torts such as Mendez's are far more likely to present such scenarios. Ratios in excess of single digits in § 1983 suits therefore will not generally violate due process when the victim suffers no compensable injury. If we were to hold otherwise, then "*any* appreciable exemplary award would produce a ratio that would appear excessive by this measure." *Lee [v. Edwards]*, 101 F.3d [805,] 811 [ (2d Cir. 1996) ]. This would conflict with the Court's clear guidance that punitive damages should remain available under § 1983 even in the absence of a compensable injury, and that in such situations "punitive damages may be the only significant remedy available." *Smith v. Wade*, 461 U.S. 30, 55 n. 21, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (internal quotation marks omitted).

The district court did not rule otherwise, however, and awarded Mendez $5,000 in punitive damages—a ratio of 2,500 to one, which is also significantly in excess of single digits. The district

court firmly rejected the County's suggestion that the only punitive damages award that would comport with due process would be an $18 award, noting that such a small award would not be "sufficient to deter other law enforcement officers from engaging in similar conduct in the future." Although we agree that the second *Gore* guidepost may have reduced relevance in § 1983 suits involving only nominal damages, we do not agree with Mendez's contrary suggestion that this factor has no relevance. In this case, the jury awarded a staggering $250,000 in punitive damages, even though the jury found that Mendez suffered no compensable injury from Reyes' actions. While the second *Gore* guidepost may not be dispositive of the excessiveness of the award in this case, the great disparity between the actual and punitive damages does not cut in Mendez's favor.

*Mendez*, 540 F.3d at 1121–22. Thus, while the court could not accept a 250,000:1 ratio, it did affirm a 2,500:1 ratio.

Although I find persuasive the reasoning in out-of-circuit cases, cited above, on the limited relevance of a "proportionality" analysis in a case where nominal damages have been awarded, I am bound to follow *Mendez*, because it is at least relevant, if not controlling, Ninth Circuit authority. Indeed, ASARCO asserted in its reply brief that *Mendez* is "directly on point."

Specifically, *Mendez* counsels that, as in a § 1983 case involving only nominal damages, "[a]lthough ... the second *Gore* guidepost may have reduced relevance in [Title VII] suits involving only nominal damages, [the Ninth Circuit Court of Appeals] do[es] not agree ... that this factor has no relevance." *Id.* at 1122. Furthermore, although *Mendez* is a § 1983 case, not a Title VII discrimination case, it nevertheless clearly establishes that, in cases in which punitive damages are available, as they are for both § 1983 cases and Title VII cases, ratios in excess of single digits will not generally violate due process when the victim suffers no compensable injury, because to hold otherwise would mean that " '*any* appreciable exemplary award would produce a ratio that would appear excessive by this measure.' " *Id.* at 1121–22 (quoting *Lee*, 101 F.3d at 811). Making any appreciable exemplary award excessive would, in turn, conflict with Congress's clear guidance that punitive damages should be available under Title VII, *see* 42 U.S.C. § 1981a, even in the absence of a compensable injury. *Cf. Mendez*, 540 F.3d at 1122 (noting that such a rule in a § 1983 case would be contrary to the Supreme Court's guidance that punitive damages should be available in such a case). In such Title VII cases, as in § 1983 cases, " 'punitive damages may be the only significant remedy available.' " *Cf. id.* (quoting *Smith*, 461 U.S. at 55 n. 21, 103 S.Ct. 1625). Finally, *Mendez* clearly rejects ASARCO's argument that $9 in punitive damages should be the constitutional limit on an award of $1 in nominal damages, instead recognizing that a higher ratio may be warranted by the need to deter future misconduct. *See id.* (noting that the district court held that such a small award would not be "sufficient to deter other [defendants] from engaging in similar conduct in the future," and agreeing that the second *Gore* guidepost may have reduced relevance in § 1983 suits involving only nominal damages, and expressly rejecting the defendants' contention that $18 in punitive damages was the constitutional maximum on the award of $1 in nominal damages on two claims); *and compare Murray*, 55 F.3d at 1453 (holding, pre-*BMW*, that deterrence is relevant to the determination of constitutionally permissible punitive damages); *Bains*, 405 F.3d at 775 (post-

*BMW* case considering, in an excessiveness analysis, whether a jury could properly have concluded that the defendant failed to remedy or address the effects of discrimination, so that punitive damages were necessary to prevent such discrimination from occurring in the future).

### iii. Comparison to civil and criminal penalties.

" 'Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness.' " *Zhang*, 339 F.3d at 1044 (quoting *BMW*, 517 U.S. at 583, 116 S.Ct. 1589). Neither party has suggested that any criminal penalty provides a useful comparator here. Moreover, in *Zhang*, a race discrimination case pursuant to 42 U.S.C. § 1981, the Ninth Circuit Court of Appeals reiterated its conclusion that " '[t]here are no "civil penalties" for the type of conduct for which [the appellants were] held liable,' " that is, racially discriminatory conduct in violation of § 1981. *Id.* at 1045 (quoting *Swinton*, 270 F.3d at 820).

The court did not simply reject any consideration of the third *BMW* factor in discrimination cases. Instead, the court in *Zhang* compared the punitive damages award for a § 1981 race discrimination claim to the $300,000 cap on punitive damages on a Title VII claim, even though the Title VII cap did not apply to a § 1981 damages award, reasoning that the Title VII cap "represented a legislative judgment similar to the imposition of a civil

fine." *Id.* (citing *Swinton*, 270 F.3d at 820). Consequently, after noting that the disparity between the $10,000 fines and the multimillion dollar awards at issue in *BMW* and *State Farm* was far greater than that between the $300,000 Title VII cap and the $2.6 million award at issue in the case before it, the court held that the punitive damages award in that case did not violate due process. *Id.* More specifically, the court held that the defendant's conduct was "highly reprehensible" and that the punitive damages award of $2.6 million exceeded the compensatory damages award of $360,000 only by a single-digit multiplier. *Id.*

Although *Zhang* was a § 1981 discrimination case, it nevertheless strongly suggests that there is no civil penalty for discriminatory conduct in violation of Title VII, just as there is no civil penalty for discriminatory conduct in violation of § 1981. *See id.; Swinton*, 270 F.3d at 820. *Zhang* also strongly suggests that, in the absence of a civil penalty comparator, it is appropriate to use Title VII's statutory cap as a yardstick of constitutional excessiveness, because the Title VII cap "represent[s] a legislative judgment similar to the imposition of a civil fine." *Id.*[5] Thus, *Zhang* suggests that, in a Title VII discrimination case, a punitive damages award at the statutory cap (here $300,000, based on ASARCO's number of employees) would comport with due process, if it is otherwise supported by evidence that punitive damages were warranted.

---

**5.** Indeed, the Fifth Circuit Court of Appeals expressly reached this second conclusion, in *Abner v. Kansas City Southern R. Co.*, 513 F.3d 154 (5th Cir.2008), a Title VII and § 1981 racially hostile environment case. In *Abner*, the Fifth Circuit Court of Appeals held that "the combination of the statutory cap and high threshold of culpability for any [punitive damages] award confines the amount of the award to a level tolerated by due pro-

cess." 513 F.3d at 164. Therefore, the court held that, "[g]iven that Congress has effectively set the tolerable proportion, the three-factor *Gore* analysis is relevant only if the statutory cap itself offends due process," which that court held it did not. *Abner*, 513 F.3d at 164. The court then held that "the sufficiency of evidence to support the statutory threshold [is] a determinant of constitutional validity." *Id.*

### b. Additional factors

■ The Ninth Circuit Court of Appeals has recognized the relevance of additional factors in the determination of whether or not a punitive damages award is excessive. Although a defendant's wealth is a proper and lawful factor for the jury to consider in determining the amount of punitive damages to award, it cannot justify an otherwise unconstitutional punitive damages award. *See White v. Ford Motor Co.*, 500 F.3d 963, 976 n. 10 (9th Cir.2007) (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 427, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)). On the other hand, prior to *BMW* and *State Farm*, the Ninth Circuit Court of Appeals recognized that the determination of whether a punitive damages award is so excessive that it violates due process can involve consideration of whether the punitive damages award exceeded the amount necessary to accomplish the goals of punishment and deterrence. *Murray v. Laborers Union Local No. 324*, 55 F.3d 1445, 1453 (9th Cir.1995) (citing *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 17, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). The Supreme Court did not reject deterrence as a legitimate factor in the consideration of whether or not an award is unconstitutionally excessive in either *BMW* or *State Farm. See BMW*, 517 U.S. at 584, 116 S.Ct. 1589 (noting only that deterrence could not justify a punitive damages award without considering whether less drastic measures could be expected to achieve that goal); *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513 (recognizing that deterrence relates to reprehensibility, in that the conduct must be so reprehensible as to warrant imposition of punitive damages as a further sanction to achieve punishment and deterrence). Moreover, in a post-*BMW* case, the Ninth Circuit Court of Appeals concluded, in an excessiveness analysis, that a jury could properly have concluded that the defendant failed to remedy or address the effects of discrimination, so that punitive damages were necessary to prevent such discrimination from occurring in the future. *Bains*, 405 F.3d at 775.

### c. The due process calculation

i. The amount of punitive damages to consider. The parties have assumed—as did I, originally—that the amount of punitive damages to be considered in the due process excessiveness analysis is not the $868,750.00 awarded by the jury, but the $300,000 available under the statutory cap in this Title VII case, pursuant to 42 U.S.C. § 1981a(b)(3)(D), for an employer with the number of employees that ASARCO has.[6] For example, this assumption was the basis for arguments that an award of punitive damages at the statutory cap should be reserved for the most reprehensible cases—and ASARCO argues that this is not such a case—and that, because the statutory cap applies to both compensatory and punitive damages, an award of $300,000 in punitive damages, when only nominal damages are awarded, skews the effect of the statutory cap, permitting a larger punitive damages award in a nomi-

---

**6.** For an employer "who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, § 1981a(b)(3)(D) imposes a cap of $300,000 for '[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section ... for each complaining party.'" The statute does not include in the pertinent "sum" any nominal damages. Thus, while the issue is not free from all doubt, I believe that the applicable statutory cap for Aguilar's punitive damages award is $300,000, not $299,999, as the plaintiffs have stated in their briefing.

nal damages case than in a compensatory damages case. However, neither of these arguments is actually an argument about whether a punitive damages award at the statutory cap of $300,000 in this case is unconstitutionally excessive, although each may be an argument about the wisdom of a statutory cap. Instead, the applicability of a statutory cap is necessarily a separate question from applicability of due process limitations.

Specifically, the nature of a cap is precisely that it limits the amount of damages, compensatory and punitive, that might *otherwise* have been awarded. Thus, the cap necessarily trumps any other "reprehensibility" analysis, limiting the punitive damages award, even where the "reprehensibility" of the defendant's conduct would have supported a higher punitive damages award over due process excessiveness objections. Similarly, a statutory cap trumps a "proportionality" analysis, because it can skew the ratio between punitive damages and compensatory damages. For example, while a Title VII plaintiff who receives $50,000 in compensatory damages might be awarded $450,000 in punitive damages without exceeding the single-digit multiplier that is likely to comport with due process, *see Zhang*, 339 F.3d at 1044, such a plaintiff whose claim is subject to the $300,000 statutory cap can only receive a punitive damages award of $250,000. An even more dramatic example is the case of a plaintiff, subject to a $300,000 cap, who receives $250,000 in compensatory damages, but who can only receive another $50,000 in punitive damages, notwithstanding that the same plaintiff could be awarded $2,250,000 in punitive damages without exceeding the single-digit multiplier that is likely to comport with due process. On the other hand, due process might well limit a punitive damages award to an amount *well below* an applicable statutory cap. For example, if a plaintiff suffered

$2,500 in compensatory damages from a single incident, involving conduct that was more accidental than malicious, due process might well limit that plaintiff's punitive damages award to $22,500, a single-digit multiplier, *cf. Bains*, 405 F.3d at 775, and a total amount for compensatory and punitive damages below the statutory cap, for an employer of any size, imposed by 42 U.S.C. § 1981a(b)(3).

In short, rather than applying an unconstitutional excessiveness analysis to a "capped" punitive damages award, I believe that the proper approach is to consider the *jury's* punitive damages award in light of the factors pertinent to an unconstitutional excessiveness analysis. Then, if due process would otherwise permit a larger award, I must reduce the punitive damages award to the amount that, combined with any compensatory damages, conforms to the applicable statutory cap.

This is not to say that the statutory cap is completely irrelevant to the constitutionality analysis, at least in light of the decision of the Ninth Circuit Court of Appeals in *Zhang*. That decision suggests that Title VII's statutory cap substitutes for a comparable civil penalty, the third *BMW* factor, as a yardstick of constitutionality of a punitive damages award in discrimination cases. *See Zhang*, 339 F.3d at 1045 (using Title VII's statutory cap as a comparator in a § 1981 discrimination case, because there was no civil penalty for discrimination claims, and the statutory cap represented a legislative judgment similar to a civil penalty); *see also Abner*, 513 F.3d at 164 (holding that the combination of the statutory cap and a high threshold for culpability for punitive damages in a Title VII case confined a punitive damages award within the cap to a level tolerated by due process). The cap just is not the starting point in such an analysis, although

it may be the last measure of constitutional excessiveness.

Therefore, I will apply the unconstitutional excessiveness analysis, at least in the first instance, to the *jury's* "uncapped" punitive damages award of $868,750.00.

*ii. Consideration of the pertinent factors.* Considering "proportionality" first, the factor on which ASARCO places the most reliance, the decision of the Ninth Circuit Court of Appeals in *Mendez* makes clear that the "proportionality" factor still has some relevance in a case involving nominal damages and punitive damages, but that "[r]atios in excess of single digits in § 1983 suits ... will not generally violate due process when the victim suffers no compensable injury." *Mendez,* 540 F.3d at 1121. Thus, I have no hesitation dismissing ASARCO's argument that the punitive damages award here should be limited to $9, a single-digit multiplier. *See id.* at 1122 (affirming the district court's rejection of the defendant's argument that the only punitive damages award that would comport with due process on a nominal damages award of $1 was $9 for each claim, or a total of $18). On the other hand, it would be disingenuous to ignore the fact that, at first blush, the jury's punitive damages award here raises a "proportionality" concern when compared to the $1 nominal damages award. *Cf. id.* at 1122 (describing a much smaller 125,000:1 disparity between nominal damages and punitive damages in a § 1983 civil rights case as so "staggering" as to raise due process concerns). The huge difference here between the jury's punitive damages award and the nominal damages award may not cut in the plaintiffs' favor. *Id.*

Nevertheless, I cannot read *Mendez* to dictate that, in this case, a ratio in excess of either 125,000:1 or 2,500:1 is necessarily excessive. Where a dollar in nominal damages is awarded, *Mendez* does not, as ASARCO implies, create a constitutional due process mandatory maximum cap on punitive damages of $2,500.00 for all cases. While *Mendez* creates a daunting task for plaintiffs to tackle in nominal damages cases where a large punitive damage amount is awarded, it does not impose a limit that is an across-the-board proxy for an individualized assessment of the *BMW* factors. First, *Mendez* is not a discrimination case, but a civil rights case. Second, it is not a case subject to a statutory cap on punitive damages, in which the cap itself may inform the excessiveness analysis. Rather, I read the appellate court's affirmance of the district court's remittitur of the punitive damages award to a 2,500:1 ratio in *Mendez* to mean nothing more than that a 2,500:1 ratio was *not* excessive *in that case. See Mendez,* 540 F.3d at 1122–23 (holding that, in light of the *BMW* guideposts, "the jury's award was unconstitutionally excessive in violation of due process and therefore properly remitted by the district court"). Ultimately, the fact that the jury's punitive damages award in this case may cause concern, in light of the "proportionality" *BMW* factor, does not prove that the award was constitutionally excessive. *Zhang,* 339 F.3d at 1045. Moreover, as the Fifth and Second Circuit Courts of Appeals have recognized, " 'there is some unseemliness for a defendant who engages in malicious or reckless violations of legal duty to escape either the punitive or deterrent goal of punitive damages merely because either good fortune or a plaintiff's unusual strength or resilience protected the plaintiff from suffering harm.' " *Abner,* 513 F.3d at 163–64 (quoting *Cush–Crawford,* 271 F.3d at 359). Thus, I must consider other pertinent factors, including the "reprehensibility" factor, to determine whether the "unseemliness" recognized by these courts would be present in this case, were I to reduce the

jury's punitive damages award as drastically as ASARCO requests.

 I do, indeed, find that the "reprehensibility" factor, on which ASARCO also relies, is more informative here than the "proportionality" factor. However, I reach a considerably different conclusion from ASARCO on this factor. For much the same reason that I found that submission of the punitive damages prayer in this case was appropriate, I also find that the conduct was sufficiently "reprehensible" to sustain the jury's punitive damages award, over excessiveness objections. While I do not accept that any of the harassment to which Aguilar was subjected, other than touching by Johnson, was physical, I do find that the discriminatory conduct, and particularly ASARCO's response to Aguilar's complaints about it, evinced indifference or reckless disregard for Aguilar's health and safety. *Bains*, 405 F.3d at 775. Aguilar was also financially vulnerable. *Id.* While the three instances of harassment could be construed to be "isolated," as ASARCO contends, there were nevertheless repeated instances of harassment, and neither the harassment nor ASARCO's feeble response to it was accidental. *Id.* Perhaps the most reprehensible aspect of the case, I find, is ASARCO's failure to remedy or even address discriminatory conduct or the effects of discrimination in a reasonably effective way, despite a purportedly effective antidiscrimination policy. *Id.*

In terms of "reprehensibility," the circumstances of this case are distinguishable from the circumstances in *Mendez*. As the court explained in *Mendez*,

> Applying the Supreme Court's guidance in *State Farm*, the district court found that Reyes' conduct in failing to translate the consent-to-search form and illegally detaining Mendez at the police station was not so reprehensible as to justify the jury's award of punitive damages. The court noted, among other things, that although the jury found that Reyes acted with reckless disregard for Mendez's rights, there was no evidence that he acted with malice. Accordingly, on the range of reprehensible conduct identified by the Supreme Court, the district court found that "Reyes' conduct was closer to mere accident than it was to malice." The court also found, and Mendez now concedes, that there is no evidence that Reyes had acted in the same manner on any other occasion, thus making this the kind of "isolated incident" the Court found less reprehensible than repeated conduct. *State Farm*, 538 U.S. at 419, 123 S.Ct. 1513. Reyes' conduct lastly did not pose any risk to Mendez's bodily health or safety. Although the injury here was physical and emotional rather than economic, the district court noted that the jury's award of nominal damages ultimately indicated that "the harm caused by Reyes' conduct was minimal."

*Mendez*, 540 F.3d at 1121. Here, in contrast, ASARCO repeatedly failed to respond to Aguilar's complaints and there were several instances of similar harassing conduct, both at the filter plant and involving bathroom graffiti, to which ASARCO also made no adequate response. Thus, ASARCO's poor response cannot be described as simply accidental. Rather, ASARCO's conduct in response to these incidents suggests at least a higher level of indifference, if not malice, than was at issue in *Mendez*. At the very least, the harassment of Aguilar was not simply an "isolated incident," but a series of "isolated incidents." Thus, while a $2,500 punitive damages award might reasonably have represented the "reprehensibility" of the defendant's conduct in *Mendez*, such a limited award would not adequately represent

the "reprehensibility" of ASARCO's conduct here. Although ASARCO argues strenuously to the contrary, I find that this is a case in which a particularly egregious act has resulted in only a small amount of economic damages, so that it falls within the exception permitting a higher ratio of punitive damages to compensatory damages. *See Mendez*, 540 F.3d at 1121 (citing *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513).

Even if the jury's punitive damages award could not withstand due process review, if only "proportionality" and "reprehensibility" were considered, the jury's award does withstand due process scrutiny when "deterrence" is considered. The jury's punitive damages award is appropriate to deter a company of the size and with the financial resources of ASARCO [7] from similar conduct in the future, particularly in a case in which there is evidence that ASARCO is a serial violator of antidiscrimination laws. *See Mendez*, 540 F.3d at 1122 (considering, in a constitutional excessiveness analysis, whether a small award would be "sufficient to deter other [defendants] from engaging in similar conduct in the future"); *see also Bains*, 405 F.3d at 775 (post-BMW case considering, in an excessiveness analysis, whether a jury could properly have concluded that the defendant failed to remedy or address the effects of discrimination, so that punitive damages were necessary to prevent such discrimination from occurring in the future). Indeed, in my estimation, the jury's punitive damages award, rather than the amount permitted by the statutory cap, would be appropriate to obtain the desired deterrent effect on an employer of ASARCO's size and resources that engaged in the conduct at issue here.

I do not accept ASARCO's argument that, if the jury had awarded $5,000 in compensatory damages, we would necessarily be talking about whether the punitive damages award should be reduced to $45,000, that is, a 9:1 ratio, to conform to *BMW* and *State Farm*, so that it makes no sense to discuss a larger punitive damages award on a nominal damages award of $1. First, ASARCO's argument persists in treating a 9:1 ratio as a bright line, outer limit for punitive damages, which it is not. *See Zhang*, 339 F.3d at 1044 (noting that, in *State Farm*, the Supreme Court " 'decline[d] again to impose a brightline ratio which a punitive damage award cannot

---

**7.** While the general size of the company was discussed in the trial, no specific financial information was introduced. Nevertheless, I note that, on ASARCO's own web page, the company states "ASARCO is an integrated mining, smelting and refining company with approximately 2600 employees." ASARCO, http://www.asarco.com/contact-us (July 11, 2011, 9:32 a.m.). ASARCO also claims that it has the "[l]argest copper reserves in the industry" and that its domestic mines produce 350 to 400 million pounds of copper annually. ASARCO, http://www.asarco.com/about-us/ (July 11, 2011, 9:34 a.m.). Its parent company at the time of trial, GrupoMexico, also provides on its web page the following information about ASARCO:

With over 110 years of history, the American Smelting and Refining Company (AS-ARCO) is the third largest copper producer in the US, with significant reserves and interesting growth prospects.

After a difficult journey involving various legal contingencies the company incurred long before GMexico became involved, Asarco returned to GMexico's family of companies in December 2009, emerging from its restructuring process as a financially viable and solid company that will generate significant value for our investors.

GRUPOMEXICO, http://www.gmexico.com/business-lines/asarco.php (July 11, 2011, 9:37 a.m.). Finally, GrupoMexico's web page indicated net consolidated earnings for GrupoMexico of US$ 532 million for the first quarter of 2011 on consolidated sales of US$ 2.505 billion for a 26% increase over the 2010 first quarter. GRUPOMEXICO, http://www.gmexico.com/files/CEO%20Report%201Q11.pdf (July 11, 2011, 9:40 a.m.).

exceed,'" 538 U.S. at 425, 123 S.Ct. at 1524, even though the Supreme Court observed that " '[i]n practice, few awards exceeding a single-digit ratio ... will satisfy due process,'" and that " '[s]ingle-digit multipliers are more likely to comport with due process'" than the extreme ratios found in *BMW* or *State Farm* ). Second, ASARCO's argument considers only the "proportionality" factor, not other relevant considerations, including "reprehensibility," the statutory cap, and deterrence. Finally, ASARCO's argument falters in light the "unseemliness" here of allowing AS-ARCO, which engaged in reckless violations of its duty to protect its employees from sexual harassment, to escape from a substantial punitive damages award that would serve the punitive and deterrent goals of punitive damages, merely because of the good fortune that Aguilar suffered little harm. *Abner,* 513 F.3d at 163–64 (quoting *Cush–Crawford,* 271 F.3d at 359).

Because I find that the jury's punitive damages award withstands due process "excessiveness" scrutiny, I must reduce the award to the statutory cap of $300,000. To the extent that Title VII's statutory cap replaces a comparable civil penalty and other factors as a yardstick of constitutionality of a punitive damages award in discrimination cases, *cf. Zhang,* 339 F.3d at 1045 (using Title VII's statutory cap as a comparator in a § 1981 discrimination case, because there was no civil penalty for discrimination claims); *see also Abner,* 513 F.3d at 164 (holding that the combination of the statutory cap and a high threshold for culpability for punitive damages in a Title VII case confined a punitive damages award within the cap to a level tolerated by due process), an award at the statutory cap here is constitutional.

### E. Summary

I will grant ASARCO's motion for judgment as a matter of law only to the extent that I will reduce the punitive damages award to the statutory limit of $300,000.

### III. ASARCO'S ALTERNATIVE MOTION FOR NEW TRIAL

As Rule 50(b) permits, ASARCO has also moved, in the alternative, for a new trial pursuant to Rule 59 on the plaintiffs' sexual harassment claims. ASARCO asserts two grounds for a new trial: (1) my supplemental instruction misled the jury; and (2) I improperly allowed "me too" evidence to be presented to the jury. I will consider each of these contentions in turn, but I will first address the standards for a new trial pursuant to Rule 59.

### A. Applicable Standards

 . Rule 59(a) of the Federal Rules of Civil Procedure provides that, after a jury trial, the court "may, on motion, grant a new trial on all or some of the issues ... for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R.CIV.P. 59(a)(1)(A). As the Ninth Circuit Court of Appeals has noted, " 'Rule 59 does not specify the grounds on which a motion for a new trial may be granted.'" *Molski v. M.J. Cable, Inc.,* 481 F.3d 724, 729 (9th Cir.2007) (quoting *Zhang,* 339 F.3d at 1035). The court then clarified the circumstances in which such a' motion may be granted, as follows:

> [T]he court is "bound by those grounds that have been historically recognized." [*Zhang,* 339 F.3d at 1035.] Historically recognized grounds include, but are not limited to, claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940).

*Molski,* 481 F.3d at 729.[8] "[E]rroneous jury instructions, as well as the failure to give adequate instructions, are also bases for a new trial." *Murphy v. City of Long Beach,* 914 F.2d 183, 187 (9th Cir.1990); *see also Montgomery Ward & Co.,* 311 U.S. at 251, 61 S.Ct. 189 ("The motion for a new trial ... may raise questions of law arising out of alleged substantial errors in ... instructions to the jury"). Similarly, erroneous evidentiary rulings may also be the basis for a new trial. *In re First Alliance Mortgage Co.,* 471 F.3d 977, 999–1001 (9th Cir.2006) (considering whether erroneous evidentiary rulings were the basis for a new trial pursuant to Rule 59); *see also Montgomery Ward & Co.,* 311 U.S. at 251, 61 S.Ct. 189 ("The motion for a new trial ... may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence"). "A district court's decision concerning a motion for a new trial is reviewed for an abuse of discretion." *SEC v. Todd,* 642 F.3d 1207, 1225 (9th Cir.2011) (citing *EEOC v. Pape Lift, Inc.,* 115 F.3d 676, 680 (9th Cir.1997), in turn citing *Browning–Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 278, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989)).

### B. Misleading Supplemental Jury Instruction

#### 1. Arguments of the parties

ASARCO's first ground for a new trial is that I erred in giving a supplemental in-struction, in answer to a question from the jury, stating, "The word 'conduct' can apply to one or more situations," and instructing the jurors to consider this supplemental instruction together with the jury instructions I had previously given them and to consider the instructions as a whole. ASARCO argues that the jury's question asked whether the elemental tests set forth in the jury instruction must be applied to all of the situations that made up Aguilar's sexual harassment claim. ASARCO contends that, because I purportedly failed to answer that question in the affirmative, I left the jury free to pick and choose among different types of conduct and situations to satisfy all of the elements of a sexual harassment claim. ASARCO contends that, given the isolated and unrelated situations at issue in this case, I should have stuck with the earlier draft version of the response to the jury's question, which ASARCO approved, stating that "each situation must be proved by the greater weight of the evidence." Here, ASARCO contends that it was prejudiced, because each of the three isolated situations failed to satisfy one or more of the various elements necessary to prove a hostile work environment claim.

The plaintiffs contend that instructional error requires consideration of whether the instructions, considered as a whole, were inadequate or misleading. Here, they argue, there was no error, because the first element of the "elements" instruc-

---

**8.** Probably the most common basis for a new trial motion is that the verdict was against the weight of the evidence. On a motion on this ground, "[a]lthough the trial judge can weigh the evidence and assess the credibility of witnesses, [the appellate court] may not." *Kode v. Carlson,* 596 F.3d 608, 612 (9th Cir.2010). Instead, the appellate court's review is limited to whether the trial court's ruling on the motion was a "clear" abuse of discretion to emphasize the appellate court's deference to the jury's findings and the appellate court's obligation to decide matters of law, not fact. *Id.* Thus, a trial judge's denial of a Rule 59 motion on the ground that the verdict is *not* against the weight of the evidence is " 'virtually unassailable,' " as it may be reversed only where there is " 'an *absolute absence of evidence* to support the jury's verdict.' " *Id.* (quoting *Desrosiers v. Flight Int'l of Fla., Inc.,* 156 F.3d 952, 957 (1998), with emphasis in the original). ASARCO's Rule 59(a) motion is not based on a contention that the verdict is against the weight of the evidence.

tion on the hostile environment claim, Instruction No. 5, required that Aguilar be subjected to sexually offensive conduct or conditions by one or more co-workers, elements two and three referred to "such conduct," and element four refers to "the conduct," that is, the same "conduct" at issue in the first element. Thus, the plaintiffs assert that the supplemental instruction, in conjunction with the original "elements" instruction, was not an invitation to pick and choose. Rather, the supplemental instruction clarified that each "situation" was to stand on its own, but that it was not necessary that the jury find that *every* situation satisfied all eight of the elements of the claim in order for the plaintiffs to prevail. As I understand the plaintiffs' argument, it is that the instructions properly explained that the plaintiffs were not required to prove that all three situations alleged satisfied all eight elements of their claim, but only that one or more of the situations, taken together, satisfied all eight elements.

In reply, ASARCO argues that, while the draft response was correct, the response ultimately given to the jurors was ambiguous and failed to answer the critical question of whether each "situation" had to meet the test of sexual harassment. ASARCO reiterates that, had the jury been properly instructed, the jury would not have returned a verdict in favor of the plaintiffs on their sexual harassment claim, because no one situation met all eight of the tests outlined in the instructions.

### 2. *Analysis*

■■■ " 'An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless.' " *Dang v. Cross,* 422 F.3d 800, 811 (9th Cir.2005) (quoting *Caballero v. City of Concord,* 956 F.2d 204, 206 (9th Cir.1992)). In evaluating whether a particular jury instruction was erroneous, the court must consider the jury instructions as a whole. *See Duran v. City of Maywood,* 221 F.3d 1127, 1130 (9th Cir.2000) (evaluating jury instructions to decide whether, read as a whole, they "fairly and adequately cover the issues presented, correctly state the law, and are not misleading"); *Swinton,* 270 F.3d at 802 (same). If the instruction is erroneous, the burden shifts to the party seeking to uphold the verdict to show that it is more probable than not that the jury would have reached the same verdict had it been properly instructed. *Dang,* 422 F.3d at 811.

I do not believe that ASARCO preserved its present objection to the response to the jurors' question. ASARCO argued at oral arguments that it had not had the opportunity to object to the final version of the response to the jurors' question, because I indicated that I needed to make a decision and ruled that I was going to give the version ultimately provided to the jurors. The record reflects, however, that the conference with the parties on the response to the jurors' question concluded as follows:

THE COURT: Here's what I'm going to do because I just need to rule.

MS. FORBES [Counsel for plaintiff Aguilar]: Right.

THE COURT: I'm just going to say the word conduct can apply to one or more situations, period. And then we'll see if we get a second note. And any other record you want to make?

MR. BARTON [Counsel for defendant ASARCO]: No, Your Honor. Thank you.

THE COURT: Okay. Thank you. And thank you for doing research on it too. It's always better than shooting in the dark, you know.

MR. BARTON: Yes.

THE COURT: I appreciate that. Okay. That's what I'm going to do, and we'll see where it takes us. Thank you. April 14, 2011, Conference, Realtime Transcript, 11:25–12:14. Counsel for ASARCO did not make even a *pro forma* objection to preserve the error, when offered the opportunity to do so. Nevertheless, I will consider the merits of ASARCO's argument that I erred in responding to the jurors' question.

▮ Even on the merits, ASARCO's argument fails. First, I do not find that the supplemental jury instruction that I gave contained the error that ASARCO alleges. Specifically, I am not convinced by ASARCO's interpretation of the question posed by the jury as asking whether the elemental tests set forth in the jury instruction must be applied, separately, to each of the situations that made up Aguilar's sexual harassment claim. Rather, the jury posed the straight-forward question of whether or not the "conduct" at issue in the first four elements of Instruction No. 5 can apply to one or more situations, that is, whether *one or more* of the situations alleged could be the "conduct" at issue for the claim.

Second, as noted above, ASARCO cites no case standing for the proposition of law on which this claim of error depends, that each individual situation had to constitute sexual harassment, standing alone, for the plaintiffs to prevail. ASARCO cites authority for the proposition that "isolated incidents" of alleged sex-based conduct may not create a hostile work environment, *see, e.g., Candelore v. Clark County Sanitation Dist.,* 975 F.2d 588, 590 (9th Cir.1992) (stating that "isolated incidents of sexual horseplay" did not create a hostile work environment), but "[w]hether a working environment is objectively 'abusive' *'can be determined only by looking at all the circumstances,'* which 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.... [N]o single factor is required.'" *Prospect Airport Servs., Inc.,* 621 F.3d at 999 (citing *Harris,* 510 U.S. at 23, 114 S.Ct. 367) (emphasis added). Thus, the jury was entitled to consider whether or not the environment was hostile on the basis of *one or more* of the situations alleged.

Third, contrary to ASARCO's contentions, the supplemental instruction provided did *not* invite jurors to cherry pick incidents, some of which satisfied only some elements, and some of which satisfied others, particularly when the supplemental instruction is read in the context of the "elements" instruction, Instruction No. 5. *See Duran,* 221 F.3d at 1130 (evaluating jury instructions to decide whether, read as a whole, they "fairly and adequately cover the issues presented, correctly state the law, and are not misleading"); *Swinton,* 270 F.3d at 802 (same). Rather, the "elements" instruction and the supplemental instruction clarified that, whether the "conduct" at issue was one or more of the instances alleged, the "conduct" had to satisfy all of the elements of the claim. Specifically, in Instruction No. 5, I defined the "elements" of the sexual harassment claim—omitting for now the explanations provided for several of these elements—as follows: "One, Ms. Aguilar was subjected *to sexually offensive conduct* or conditions by one or more co-workers"; "Two, *such conduct* was unwelcome"; "Three, *such conduct* was because of Ms. Aguilar's sex"; "Four, *the conduct* was sufficiently severe or pervasive to alter the conditions of Ms. Aguilar's employment and create a sexually abusive or hostile work environment"; "Five, Ms. Aguilar considered the working

environment to be abusive or hostile"; "Six, a reasonable woman in Ms. Aguilar's circumstances would have considered the working environment to be abusive or hostile"; "Seven, the defendant or a member of the defendant's management knew or should have known of the harassment"; and "Eight, despite such knowledge, the defendant failed to take prompt, effective remedial action reasonably calculated to end the harassment." Jury Instruction No. 5 (emphasis added). It is clear from this jury instruction, taken as a whole, that the "conduct" at issue in each subsequent element must be the "conduct" identified in element *one*, and that the "conduct" must create the hostile environment at issue in elements *four, five, six, seven,* and *eight*. The supplemental jury instruction simply clarified that the "conduct" could be more than one situation, taken as a whole; it did *not* have to be a single situation, standing alone. *Prospect Airport Servs., Inc.,* 621 F.3d at 999.

■ Yet, even supposing that the supplemental instruction I gave was erroneous—that is, that the jury should have been told that the plaintiffs could not prevail on the sexual harassment claim unless at least one of the incidents alleged, standing alone, satisfied all eight elements of the claim—I am not convinced that it is more probable than not that the verdict would have been different had I given the response that ASARCO preferred. *Dang,* 422 F.3d at 811. First, the answer that ASARCO preferred—explaining, "The word 'conduct' can apply to more than one situation but each situation must be proved by the greater weight of the evidence"— does not instruct the jurors that they must find that each instance on which Aguilar's sexual harassment claim relied met all eight elements of her claim for that instance to support a verdict in her favor on that claim. Rather, requiring proof of a

"situation" by the greater weight of the evidence simply requires proof by sufficient evidence that the situation did, indeed, occur. It does not require proof that the individual situation, by itself, constituted actionable harassment.

Moreover, for the reasons stated above, in my analysis of ASARCO's motion for judgment as a matter of law, while reasonable minds could disagree, each of the three incidents alleged involved sexually offensive conduct; the conduct in each incident was unwelcome; it was because of Aguilar's sex; it was sufficiently severe to create a sexually hostile work environment; Aguilar certainly considered the working environment hostile; a reasonable person in Aguilar's circumstances would have considered the working environment to be hostile; the defendant or a member of defendant's management knew or should have known of the harassment; and the defendant failed to take prompt, effective remedial action reasonably calculated to end the harassment. In my assessment of whether ASARCO was harmed by the allegedly erroneous instruction, I find it telling that ASARCO did *not* seek a new trial on the ground that the verdict on the sexual harassment claim was against the weight of the evidence, which would have allowed me independently to weigh the evidence and to assess the credibility of the witnesses. *Kode v. Carlson,* 596 F.3d 608, 612 (9th Cir.2010). It seems to me that ASARCO's failure to move for a new trial on this ground is a concession that the evidence of each of the instances was sufficient to sustain the verdict, so that ASARCO cannot claim prejudice from the allegedly misleading instruction.

ASARCO is not entitled to a new trial on the ground that the supplemental instruction was misleading or erroneous.

### C. Erroneous Admission Of "Me Too" Evidence

#### 1. Arguments of the parties

ASARCO argues that it is entitled to a new trial on the ground that I improperly admitted evidence at trial that a former ASARCO employee, Larry Miller, had been subjected to pornographic graffiti before Aguilar was ever employed by ASARCO, and that one of Aguilar's alleged harassers, Julio Esquivel, was subjected to pornographic graffiti, even though Aguilar had never seen that graffiti. ASARCO contends that the admission of such evidence is "undoubtedly" part of the reason that the jury attempted to punish ASARCO for harm done to persons other than Aguilar. ASARCO contends, however, that the graffiti concerning two male employees had absolutely no probative value as to whether or not Aguilar was sexually harassed in violation of Title VII and the ACRA, but was used by Aguilar to invoke the passion and prejudice of the jury against ASARCO.

The plaintiffs contend that ASARCO has not made a showing of prejudicial error from the admission of the other graffiti evidence. They point out that, in my pretrial ruling on ASARCO's motion in limine, I allowed only "circumscribed" evidence of an incident of pornographic graffiti in a restroom directed at Esquivel on the ground that such evidence was relevant to ASARCO's reckless indifference to Aguilar's rights and the reprehensibility of AS-ARCO's conduct for punitive damages purposes. They contend that such graffiti evidence was effective, not because it was "shockingly graphic," as ASARCO contends, but because it showed that ASARCO tolerated workplace pornography and maintained a cavalier attitude toward its responsibilities under the equal employment laws. Similarly, they argue that the evidence of pornographic graffiti in a restroom directed at Miller, presented at trial, was properly admitted to provide further evidence of ASARCO's attitude and to corroborate certain managerial employees' references to "the Larry Miller story." Even if the evidence was not properly admitted, the plaintiffs contend that admitting it was not prejudicial error. This is so, they argue, because evidence of the Esquivel and Miller pornography incidents form only a small portion of the evidence upon which the jury's award of punitive damages presumably rests, as more fully argued elsewhere, so that the other graffiti evidence is not the only evidence purportedly relevant to punitive damages.

#### 2. Analysis

■ Erroneous evidentiary rulings may also be the basis for a new trial, but only if the error more likely than not affected the verdict. *In re First Alliance Mortgage Co.,* 471 F.3d 977, 999–1001 (9th Cir.2006) (finding no error in the district court's refusal to grant a new trial based on allegedly prejudicial evidentiary rulings); *see also* FED.R.CIV.P. 61 (providing that admitting or excluding evidence is not a ground for a new trial unless "justice requires," because the evidentiary ruling affected a party's "substantial rights"). I do not believe that the admission of the evidence challenged here was either erroneous or prejudicial.

■ In my ruling on the motion in limine and at trial, I allowed only "circumscribed evidence" of other incidents of pornographic graffiti in a restroom before (Miller) and after (Esquivel) Aguilar's complaints and administrative charge on the ground that such evidence was relevant to both ASARCO's reckless indifference to Aguilar's federally protected rights, that is, the perceived risk that its actions would violate federal law, *see Dukes v. Wal–Mart Stores, Inc.,* 603 F.3d

571, 621–22 (9th Cir.2010) (citing 42 U.S.C. § 1981a(b)(1) for this standard in a Title VII case), and the "reprehensibility" of ASARCO's conduct, for purposes of determining what, if any, punitive damages should be awarded against ASARCO for similar conduct toward Aguilar, because it demonstrates a failure to remedy known harassing conduct. *Cf. Bains, L.L.C. v. Arco Prods. Co., Div. of Atlantic Richfield Co.*, 405 F.3d 764, 775 (9th Cir.2005) (a clear failure to remedy or even address the discriminatory effects of the defendant's employee's conduct could properly have led a jury to conclude that punitive damages were necessary to prevent such discrimination from occurring in the future, but " '[r]eprehensibility should be discounted if defendants act promptly and comprehensively to ameliorate any harm they cause in order to encourage such socially beneficial behavior' ") (quoting *In re Exxon Valdez*, 270 F.3d 1215, 1242–43 (9th Cir.2001)). Such circumscribed evidence consisted of testimony that Esquivel also saw and complained to management about pornographic graffiti in a restroom several months after Aguilar's complaints, her departure from her employment, and her administrative charge, and that Miller saw and complained about pornographic graffiti in a restroom before Aguilar was employed at ASARCO. The circumscribed nature of the evidence limited any potential prejudice to ASARCO.

Moreover, as the plaintiffs contend, and my analysis of ASARCO's motion for judgment as a matter of law, above, indicates, the "other graffiti" evidence was not the only evidence relevant to punitive damages. *See, e.g., Schudel v. General Electric Co.*, 120 F.3d 991, 996 (9th Cir.1997) (requiring a new trial where inadmissible evidence was the only evidence on the issue of causation), *cert. denied*, 523 U.S. 1094, 118 S.Ct. 1560, 1561, 140 L.Ed.2d 792 (1998), *abrogated on other grounds, Weis-*

*gram v. Marley Co.*, 528 U.S. 440, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000); *Powell v. Levit*, 640 F.2d 239, 241 (9th Cir.1981) (holding that the Rule 61 prejudice standard was met where the erroneously admitted evidence of the plaintiff's juvenile and adult felony offenses was clearly prejudicial, because the case turned almost entirely on relative credibility of the party-witnesses).

ASARCO is not entitled to a new trial on the basis of erroneously admitted "me too" evidence, either.

### D. Summary

I conclude that ASARCO is not entitled to judgment as a matter of law on either the plaintiffs' sexual harassment claim or their prayer for punitive damages on that claim, other than a reduction of the jury's punitive damages award to the Title VII statutory cap of $300,000. I also conclude that ASARCO is not entitled to a new trial on the basis of either a misleading supplemental instruction or erroneous admission of evidence.

### IV. THE PLAINTIFFS' REQUEST FOR EQUITABLE AND INJUNCTIVE RELIEF

The denial of ASARCO's post-trial motion, except as to the amount of the punitive damages award, means that I must consider the plaintiffs' Joint Supplemental Memorandum Regarding Their Request For Injunctive And Equitable Relief (docket no. 332). The relief they seek is an order enjoining ASARCO to create or modify and implement an adequate policy against sexual harassment and to require certain training of managers, supervisors, and other employees, concerning sexual harassment. ASARCO admits in its Response (docket no. 339) that, despite having already adopted adequate anti-harassment policies and training requirements, it

initially planned to stipulate to the plaintiffs' Request. However, ASARCO asserts that it changed its mind, because of a misleading press release by the State Attorney General's office concerning the outcome in this case. ASARCO now objects to the entry of any order that could be construed to suggest that ASARCO does not have an effective anti-harassment policy or adequate anti-harassment training program. In their Reply (docket no. 342), the plaintiffs assert that ASARCO's supposedly "voluntary" updating of its anti-harassment policy and additional training is actually the result of a signed conciliation agreement with the ARCD in another case, undermining any inference that AS-ARCO is unlikely, without compulsion, to take appropriate steps to prevent and investigate harassment. The plaintiffs also assert that the training pursuant to that conciliation agreement does not exceed the training that the plaintiffs have requested pursuant to equitable and injunctive relief in this case. Finally, the plaintiffs assert that there remains a possibility of future discrimination that warrants the equitable and injunctive relief requested.

The pertinent provision of the Arizona Civil Rights Act provides as follows:

G. If the court finds that the defendant has intentionally engaged in or is intentionally engaging in an unlawful employment practice alleged in the complaint, *the court may enjoin the defendant from engaging in such unlawful employment practice and order such affirmative action as may be appropriate. Affirmative action may include, but is not limited to,* reinstatement or hiring of employees with or without back pay payable by the employer, employment agency or labor organization responsible for the unlawful employment practice or *any other equitable relief as the court deems appropriate.* Back pay liability shall not accrue from a date more than

two years prior to the filing of the charge with the division. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union or the hiring, reinstatement or promotion of an individual as an employee or the payment to him of any back pay if such individual was refused admission, suspended or expelled or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, age, handicap or national origin or a violation of § 41–1464.

A.R.S. § 41–1481(G) (emphasis added). As the Arizona Court of Appeals has noted, the federal statute, 42 U.S.C. § 2000e–5(g), is "similarly worded." *Timmons v. City of Tucson,* 171 Ariz. 350, 353, 830 P.2d 871, 875 (Ariz.App.1991).

More importantly, the Arizona Court of Appeals has recognized the appropriateness of equitable relief in most cases:

With regard to the first objective of the statute, that is, the elimination of the unlawful employment practice, injunctive relief is not only appropriate but necessary. Such relief is inappropriate only where elimination of the practice has been affirmatively demonstrated through an affirmative action program or otherwise. *Manning v. International Union,* 466 F.2d 812 (6th Cir.1972), cert. denied, 410 U.S. 946, 93 S.Ct. 1366, 35 L.Ed.2d 613 sub nom. *Manning v. General Motors Corp.* (1973). Indeed, absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law, a grant of injunctive relief is mandatory. *James*

v. Stockham Valves & Fittings Co., 559 F.2d 310 (5th Cir.1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).

Civil Rights Div. of Arizona Dep't of Law v. Superior Court In and For the County of Pima, 146 Ariz. 419, 424, 706 P.2d 745, 750 (Ariz.App.1985).

 Here, I find that ASARCO's assertions that its recent policy update and training regime mean that there is no reasonable probability of further noncompliance with the law to be well short of "clear and convincing proof." Id. As the plaintiffs point out, that new policy and training regime are not voluntary, but compelled, and the record in this case shows a history of cavalier treatment of sexual discrimination and sexual discrimination complaints. Under the circumstances, I find that the affirmative action that is appropriate to prevent future discrimination here includes the equitable and injunctive relief requested by the plaintiffs. A.R.S. § 41–1481(G).

### V. CONCLUSION

Upon the foregoing,

1. That portion of ASARCO's May 12, 2011, Renewed Motion For Judgment As A Matter Of Law Or In The Alternative Motion For New Trial (docket no. 340) seeking judgment as a matter of law is **granted,** to the extent that the punitive damages award is reduced to the statutory cap of $300,000, but otherwise **denied;**

2. That portion of ASARCO's May 12, 2011, Renewed Motion For Judgment As A Matter Of Law Or In The Alternative Motion For New Trial (docket no. 340) seeking a new trial is **denied;** and

3. The plaintiffs' April 21, 2011, Request For Injunctive And Equitable Relief (docket no. 332) is **granted,** as follows:

A. Within thirty (30) days of entry of judgment directed in paragraph 4., below, ("Entry of Judgment"), ASARCO will create a policy, modify its existing policies, or confirm in writing that it has an existing policy that prohibits sexual harassment, including display of pornographic graffiti, as defined by federal and Arizona law, and sets out a procedure for complaining of and investigating allegations of sexual harassment. Specifically, the policy will include, at minimum, the following:

i. a strong and clear statement that sexual harassment will not be tolerated in the workplace;

ii. a statement encouraging persons who believe they have experienced sexual harassment at work to complain of sexual harassment and that such complaints may be made to ASARCO Unit Management, ASARCO HR or the Civil Rights Division of the Arizona Attorney General's Office ("ACRD");

iii. information about the phone number, website, and physical address of the ACRD;

iv. a process by which a person can internally complain of alleged discrimination and/or retaliation that does not require any complaint to be made in writing, and does not require the employee or candidate to report the alleged discrimination and/or retaliation to the person alleged to have discriminated and/or retaliated against the person;

v. the job title(s) of ASARCO's employee(s) responsible for accepting complaints of discrimination and/or retaliation;

vi. a statement that unlawful discrimination and/or retaliation violates state and federal civil rights laws;

vii. a description of the range of consequences that may be imposed on

violators of the sexual harassment policy;

viii. a statement of intent to handle complaints of discrimination, including harassment and retaliation, as confidentially as appropriate under the circumstances;

ix. a statement of assurance of non-retaliation for persons who believe they have been subjected to sexual harassment and for witnesses interviewed during an investigation into allegations of harassment; and

x. a statement of assurance that allegations of sexual harassment will be investigated promptly, fairly, reasonably, and effectively, and that appropriate corrective action will be taken if harassment is found to have occurred.

B. Within one hundred twenty (120) days of Entry of Judgment, all ASARCO Mission Mine complex managers and supervisors, including mill shift supervisors and DCS supervisors, and any ASARCO HR employees who participate in the investigation of workplace harassment complaints, will attend individualized training by a qualified trainer on issues related to the following:

i. maintaining a workplace free of unwanted physical and verbal conduct that creates a sexually hostile work environment;

ii. an employer's legal obligations as they relate to sexual harassment and retaliation under federal and state anti-discrimination laws;

iii. investigation techniques that emphasize confidentiality; and

iv. avoiding gender-bias during investigation.

This training will consist of at least four (4) hours of instruction. For purposes of this training, a "qualified trainer" is a person or agency knowledgeable about the legal requirements under state and federal employment laws and who has complaint investigation experience.

C. Within one hundred twenty (120) days of Entry of Judgment, all ASARCO Mission Mine complex employees will attend a one-hour training on preventing employment discrimination, including sexual harassment and retaliation. This training will include information about the implementation of the policies described above. For purposes of this training, a "qualified trainer" is a person or agency which is knowledgeable about the legal requirements under state and federal employment laws.

4. Judgment shall enter accordingly.

**IT IS SO ORDERED.**